UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL HESSE, | No. 2:21-cv-1931 WBS CSK P |
| Plaintiff, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| COUNTY OF SACRAMENTO, et al., | |
| Defendants. | |

Plaintiff is a former county jail inmate, now proceeding pro se. The motion for summary judgment filed by remaining defendant Dr. Sanga[1] is before the court. As set forth below, the undersigned recommends that the motion be granted, and judgment be entered.

Background

On November 20, 2023, plaintiff's former attorney moved to withdraw. (ECF No. 52.) On November 27, 2023, defendant Sanga filed a motion for summary judgment. On December 29, 2023, plaintiff's former attorney was granted leave to withdraw, and plaintiff was granted thirty days to file an opposition to defendant Sanga's motion. (ECF No. 59.) On January 17,

---

[1] On December 20, 2023, defendant Nurse Practitioner Stephenye Burnett was dismissed. (ECF No. 58.) On February 8, 2024, the magistrate judge recommended that the motion for summary judgment filed by County defendants (County of Sacramento, Lynn Billet, Phoebe Foo, and Dr. Andrew Ho) be granted. (ECF No. 61.) On March 21, 2024, the district court adopted the findings and recommendations and dismissed such defendants from this action with prejudice.

1

2024, plaintiff, now proceeding pro se, was provided notice of the requirements for opposing a motion for summary judgment,[2] and granted an additional thirty days in which to file an opposition to defendant Sanga's motion. (ECF No. 60.) Plaintiff did not file an opposition to the motion or otherwise respond to the court's order.

Although it appears from the file that plaintiff's copy of the January 17, 2024 order was returned, plaintiff was properly served. It is the plaintiff's responsibility to keep the court apprised of his current address at all times. Pursuant to Local Rule 182(f), service of documents at the record address of the party is fully effective.

Legal Standards for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under summary judgment practice, the moving party

> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P. 56(c)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment (recognizing that "a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

////

---

[2] Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

1    trial." Celotex Corp., 477 U.S. at 322. "[A] complete failure of proof concerning an essential

2    element of the nonmoving party's case necessarily renders all other facts immaterial." Id. at 323.

3          Consequently, if the moving party meets its initial responsibility, the burden then shifts to

4    the opposing party to establish that a genuine issue as to any material fact actually exists. See

5    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986). In attempting to

6    establish the existence of a factual dispute, the opposing party may not rely upon the allegations

7    or denials of its pleadings and is required to tender evidence of specific facts in the form of

8    affidavits or admissible discovery to support its contention that a dispute exists. See Fed. R. Civ.

9    P. 56(c); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in

10   contention is material, i.e., a fact that might affect the outcome of the suit under the governing

11   law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v.

12   Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

13   genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving

14   party, see Wool v. Tandem Computers., Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled on

15   other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3 (9th Cir. 2002).

16         In the endeavor to establish the existence of a factual dispute, the opposing party need not

17   establish a material issue of fact conclusively in its favor. It is sufficient that "'the claimed

18   factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the

19   truth at trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting First Nat'l Bank of Arizona v. Cities

20   Serv. Co., 391 U.S. 253, 289 (1968)). "The very mission of the summary judgment procedure is

21   to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

22   trial." Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments; see also Matsushita,

23   475 U.S. at 587.

24         In resolving a summary judgment motion, the court examines facts cited by the parties

25   from the record including "depositions, documents, electronically stored information, affidavits or

26   declarations, stipulations (including those made for the purposes of the motion only), admissions,

27   interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). The evidence of the opposing

28   party is to be believed. See Anderson, 477 U.S. at 255. The court must draw all reasonable

inferences from the underlying facts in favor of the nonmoving party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Neilsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id. (citation omitted).

No opposition has been filed. Where a party fails to oppose a motion for summary judgment, "Rule 56 is clear that although a court may deem facts admitted in the exercise of its discretion, it need not do so." Warkentin v. Federated Life Ins. Co., 594 F. App'x 900, 902-03 (9th Cir. 2014) (alteration in original); see Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment ("[T]he court may choose not to consider [a] fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute"). A court, however, is not authorized to automatically grant summary judgment to a defendant solely because a plaintiff fails to oppose the motion. Cristobal v. Siegel, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994); Martinez v. Stanford, 323 F.3d 1178, 1182 (9th Cir. 2003).

Where, as here, a party does not challenge the facts asserted by the moving party, the non-moving party may be deemed to have admitted the validity of those facts. See Fed. R. Civ. P. 56(e)(2). Further, Local Rule 230(l) provides that the "[f]ailure of the responding party to file an opposition or to file a statement of no opposition may be deemed a waiver of any opposition to the granting of the motion and may result in the imposition of sanctions." Id.

Unverified Complaint

On October 15, 2021, plaintiff's former counsel filed the instant civil rights complaint which did not include a verification signed by plaintiff. (ECF No. 1.) In his first cause of action, plaintiff alleges that despite being informed about plaintiff's prior medical procedure to his right finger by Dr. Tocchi, and the order that the finger must remain splinted, or plaintiff's finger would become deformed, defendant Sanga was deliberately indifferent to plaintiff's serious

medical needs by failing to order his splint and failing to call Dr. Tocchi to determine why plaintiff was ordered to keep his finger splinted.[3] (ECF No. 1 at 6-7.) As a result, plaintiff alleges that he now suffers a permanent deformity in his right ring finger, and severe pain and emotional distress. (Id.)

Plaintiff included no allegations against defendant Sanga in the second cause of action. (ECF No. 1 at 7-8.)

In his third cause of action, plaintiff raises a state law negligence claim based on the refusal of defendant Sanga to allow plaintiff to have a splint on his right finger. (ECF No. 1 at 8-9.)

In addition to splinting, plaintiff alleges that Dr. Tocchi recommended periodic buddy taping of plaintiff's right finger. (ECF No. 1 at 3:15-17, 4:20-22.) Plaintiff also contends that by September 25, 2020, his finger was getting worse, and he requested physical therapy. (ECF No. 1 at 5:19-12.)

As a result, plaintiff alleges that his finger is permanently contracted.

Statement of Undisputed Facts ("UDF")[4]

1. On July 27, 2020, plaintiff was seen in the Emergency Department at Rideout Hospital by Dr. Lee Tocchi, an orthopedic surgeon. (Declaration of Dr. Kendrick Lee ("Lee Decl.") ¶ 9.) (ECF No. 55-6.) Plaintiff complained of "[r]ight ring finger swelling 4 days ago, swelling increased," and Dr. Tocchi described plaintiff as ""right hand dominant with swelling and redness of his right ring finger flexed slightly out of cascade. Able to move and has intact sensation in hand but subjective numbness of fingertip." (Id.)

2. Dr. Tocchi's diagnosis was abscess of the finger of the right hand, and he arranged for plaintiff to receive a metacarpal block for the hand and incision and drainage of the finger while plaintiff was in the emergency department. (Lee Decl. ¶ 10.) At his deposition, plaintiff testified that at this emergency visit, Dr. Tocchi advised plaintiff there was a risk of finger contracture and

---

[3] As discussed in more detail below, plaintiff's initial unverified allegation in his complaint that at the time plaintiff was booked into jail, he was under an order from Dr. Tocchi to wear a splint on the injured finger, it is undisputed that this is not true.

[4] For purposes of summary judgment, the undersigned finds these facts are undisputed.

described a "grim picture" of possible contracture. (Pl.'s Dep. at 44:4-16.) Following the drainage procedure, plaintiff was discharged with an antibiotic, Augmentin, and instructions to follow up in Dr. Tocchi's orthopedic clinic in two days, July 29, 2020. (Id.) Plaintiff did not keep the appointment.

   3.  Plaintiff returned to the emergency department on August 2, 2020, after he took off the dressing and wanted to have the finger checked out. (Lee Decl. ¶ 11.) Plaintiff reported Dr. Tocchi's prior procedure and stated he had been taking his antibiotics. (Id.) Following an exam and a CT scan, plaintiff was diagnosed with cellulitis; the abscess no longer appeared on imaging. (Id.) Plaintiff became impatient and refused to finish the IV Vancomycin, an antibiotic, refused the taking of vital signs on discharge, but agreed to follow up with his primary care provider in 1-2 days. (Id.)

   4.  On August 6, 2020, plaintiff was seen in the orthopedic acute care clinic by Dr. Amber Chatwin, who described plaintiff in the record as uncooperative and unpleasant with staff, refusing all but a minimal exam. (Lee Decl. ¶ 12.) The record does not mention plaintiff arrived with a splint. Plaintiff refused treatment except for Xeroform, gauze and other wound dressings, and agreed to follow up with Dr. Tocchi for an examination and dressing change. (Id.)

   5.  On August 11, 2020, plaintiff was seen by Dr. Tocchi, who noted plaintiff's finger was now in a flexed position and tender with extension. (Lee Decl. ¶ 13.) Dr. Tocchi encouraged range of motion exercises and advised plaintiff to buddy tape his finger to help with range of motion improvement. (Id.) It is now undisputed that Dr. Tocchi did not order plaintiff to wear a splint.[5] At the August 11, 2020 exam, plaintiff's finger was flexed, a known risk of the infection

---

[5] In his deposition, Dr. Tocchi testified that at the August 11, 2020 visit, he would have informed plaintiff that he did not need the splint at that point in treatment. (Tocchi Dep. at 55-56.) Also, Dr. Lee declared that at this time in plaintiff's treatment, it was Dr. Tocchi's opinion that it would no longer be advisable for plaintiff to wear a splint since a splint was for immobilization, not mobilization. (Lee Decl. ¶ 13.) At plaintiff's deposition, plaintiff confirmed that Dr. Tocchi informed plaintiff during his first visit at Dr. Tocchi's clinic that plaintiff no longer needed to wear the splint, and instead emphasized regaining mobility. (Pl.'s Dep. at 48.) Thus, despite plaintiff's initial unverified allegations in his complaint (ECF No. 1 at 3-4, 6), Dr. Tocchi did not advise plaintiff to keep a splint on his injured right finger and thus was not under an order from Dr. Tocchi to wear a splint on the injured finger at the time plaintiff was booked into jail.

especially if the patient is not working on finger exercises as instructed. (Id.) Plaintiff agreed to finish the antibiotics and follow up with Dr. Tocchi regarding range of motion. (Id.)

6. Plaintiff did not follow up with Dr. Tocchi before plaintiff was booked into Sacramento County Jail on August 20, 2020. (Lee Decl. ¶ 14.)

7. At booking, plaintiff was seen by former defendant Phoebe Foo, F.N., on August 20, 2020. (Lee Decl. ¶ 15.) The records for this visit do not reference that plaintiff presented with a splint on, or that a splint was removed.

8. On August 21, 2020 plaintiff was seen by former defendant and Nurse Practitioner Lynn Billet in the jail medical facility. (Lee Decl. ¶ 16.) Her exam of plaintiff's right finger "revealed a volar-side open wound extending to dermis approx. 1.5 x 1 cm granulating tissue," the finger was slightly contracted with swelling, and plaintiff had good sensation and circulation. (Id.) Billet cleaned and dressed the wound, prescribed Naproxen, and "encouraged passive movement to prevent contracture." (Lee Decl. ¶ 16.) Nursing provided wound care following this visit.

9. On August 27, 2020, plaintiff was seen again by Billet who noted the wound was healing well. (Lee Decl. ¶ 17.) Following Billet's exam, including of plaintiff's extremities, Billet noted plaintiff's right finger was still slightly contracted and swollen. Billet encouraged wound care and observation for signs and symptoms of infection. (Id.)

10. On September 5, 2020, LVN Natasha Schreffler advised plaintiff that he should try moving his finger as much as possible so that contractures would not form. (Lee Decl. ¶ 18.)

11. On September 7, 2020, plaintiff was seen by defendant Dr. Sanga. (Declaration of Sonia Sanga, M.D. ("Sanga Decl.") ¶ 3.) (ECF No. 55-2.) Dr. Sanga took a complete history and performed a complete physical exam. (Sanga Decl. ¶ 4; Lee Decl. ¶ 19.) As to plaintiff's right finger, Dr. Sanga noted plaintiff had "slight pain and tenderness upon passive flexion/ extension of R ring finger, R finger not flexed/extended at rest relative to other b/l fingers." (Lee Decl. ¶ 19; ECF No. 55-3 at 2 (9/7/2020 medical record).) Because plaintiff "had persistent cellulitis a month after the incision and drainage procedure," and had completed two rounds of antibiotics, Dr. Sanga ordered another course of antibiotics. (Sanga Decl. ¶ 4.) In addition, Dr. Sanga

7

1   "ordered a 30 day course of naproxen and a longer course of acetaminophen (Tylenol) for pain
2   control; "wound care with warm soaks in an antiseptic solution daily until plaintiff's cellulitis
3   symptoms resolve;" and "x-rays of plaintiff's right hand and his right ring finger;" "advised
4   plaintiff to elevate his finger and continue passive flexion/extension exercises daily;" and
5   "obtained a release of information . . . from plaintiff so his medical records from other providers
6   could be obtained."[6]  (Sanga Decl. ¶ 5; see also ECF No. 55-3 at 2.) (9/7/2020 medical record))
7   Dr. Sanga "also scheduled provider follow-ups with respect to plaintiff's finger cellulitis, pain
8   control, . . . and an orthopedic specialist."  (Sanga Decl. ¶ 6; Lee Decl. ¶ 19.)

9        12.   On September 9, 2020, Dr. Sanga reviewed the results of plaintiff's x-rays of his right
10  hand and right finger (ordered by Dr. Sanga), 'which showed soft tissue swelling and no evidence
11  of fracture or dislocation."  (Lee Decl. ¶ 20; Sanga Decl. ¶ 7.)  Dr. Sanga "documented the
12  radiology results in plaintiff's chart."  (Sanga Decl. ¶ 7.)

13       13.   On September 11, 2020, plaintiff had an orthopedic consult with former defendant Dr.
14  Andrew Ho.  (Lee Decl. ¶ 21.)  Dr. Ho's patient history noted that plaintiff's "wound was almost
15  healed, the pain and swelling was improved but the finger was stiff."  (Id.)  Following Dr. Ho's
16  clinical examination of plaintiff's hand, plaintiff "had mild edema but no redness or drainage."
17  (Id.)  Dr. Ho "measured a flexion contracture of 45 degrees PIP and 20 degrees DIP," reviewed x-
18  rays with plaintiff, and then "recommended continued wound care until the wound was healed,"
19  as well as "aggressive finger stretching and range of motion exercises for improving the finger
20  contracture."  (Id.)

21       14.   On September 16, 2020, plaintiff was seen by former defendant and Nurse
22  Practitioner Stephenye Burnett.  (Lee Decl. ¶ 22.)  Burnett performed a physical examination
23  including plaintiff's right hand and finger and noted that plaintiff was able to flex and extend the

---

[6] Despite plaintiff's claim that Dr. Sanga evaluated plaintiff again on or about September 10, 2020 (ECF No. 1 at 4), Dr. Sanga did not evaluate him again. (Sanga Decl. at ¶ 7.) On September 9, 2020, Dr. Sanga reviewed plaintiff's x-rays ordered by Dr. Sanga and documented the radiology results in plaintiff's chart. (Id.; see also ECF No. 55-5 at 1.) There is no evidence that Dr. Sanga treated plaintiff again, or that Dr. Sanga was subsequently responsible for plaintiff's treatment, during the remainder of his time at the jail, including on or after September 25, 2020, after which he claimed his finger was getting worse and he requested physical therapy.

1  finger but not fully.  (Id.)  Burnett changed plaintiff's dressings, and informed plaintiff to
2  massage the finger regularly to help maintain mobility.  Burnett explained there was no physical
3  therapy available at the jail, so plaintiff would need to do his own exercises to help return
4  mobility in his right 4th digit.  (Id.)  Burnett told plaintiff that he could use lotion from the
5  commissary to massage into his finger when exercising it.  (Id.)

6    15.  On October 3, 2020, plaintiff was seen by Jewel Royston, R.N., who cleaned and
7  dressed plaintiff's wound.  (Lee Decl. ¶ 23.)  Royston noted plaintiff's finger was contracted, and
8  she applied a coban (i.e., buddy tape) to "mobilize to 5th (sic) digit."  (Id.)

9    16.  On October 11, 2020, plaintiff was seen by Dr. Steven Friend, who noted plaintiff's
10  finger contracture and ordered a follow up with a hand surgeon.  (Lee Decl. ¶ 24.)  Dr. Friend
11  also ordered a splint "presumably for stretching to see if it would help the contracture."  (Lee
12  Decl. ¶ 24.)

13    17.  On October 15, 2020, Dr. Linda Baryliuk noted plaintiff had an upcoming
14  appointment for follow up on his finger injury.  (Lee Decl. ¶ 25.)  However, plaintiff was released
15  from the Sacramento County Jail on October 29, 2020.  (Id.)

16    18.  After plaintiff's release from jail, he was seen by Dr. Tocchi for the finger
17  contracture; plaintiff "was counseled to do self-therapy for the contracture until he could start
18  physical therapy which could take some time to be seen."  (Lee Decl. ¶ 34.)  For almost two
19  months, plaintiff participated in physical therapy, which included application of a splint at times,
20  but plaintiff's contracture became worse, not better.  (Id.)

21    19.  Plaintiff confirmed he was advised multiple times to exercise the finger to mitigate or
22  prevent development of contracture and motion loss.  (Pl.'s Dep. at 38:5-20; 54:23-55:15.)

23    20.  Plaintiff testified that he diligently exercised and massaged his finger approximately
24  50 times daily.  (Pl.'s Dep. at 59.)

25  Discussion
26   Expert Testimony
27   Defendant Dr. Sanga provided the expert medical testimony of Dr. Kendrick E. Lee, a
28  board-certified orthopedic hand surgeon, who performed an expert review of the medical care and

treatment for plaintiff's right ring finger that plaintiff received while housed at the Sacramento County Jail. Dr. Lee reviewed plaintiff's medical records from the Sacramento County Jail medical facility, Dr. Lee Tocchi, Adventist Health, and Rideout Hospital. (Lee Decl. ¶ 2.) Dr. Lee also reviewed the deposition testimony of plaintiff and Dr. Tocchi, as well as plaintiff's complaint in this action. (Id.) In Dr. Lee's professional opinion, the care and treatment provided by the Sacramento County Jail's medical providers, "to a reasonable degree of medical certainty, conformed to the standard of care," and "did not cause [plaintiff's] claimed injuries." (Lee Decl. ¶¶ 7, 8.)

In Dr. Lee's medical opinion, splinting an abscessed finger is recommended during the early days of treatment to prevent the spread of infection and provide some comfort. (Lee Decl. ¶ 27.) From two to four days following initial infection treatment, splinting is stopped, and exercises begin. (Id.) Plaintiff did not keep the July 29, 2020 orthopedic follow up appointment, and was not seen by Dr. Tocchi until August 11, 2020, at which time, according to Dr. Tocchi's deposition testimony, Dr. Tocchi discontinued plaintiff's use of the splint. (Lee Decl. ¶ 27.)

Further, Dr. Lee opined that the standard of care indicates finger motion exercises by the patient within a few days after treatment for a finger abscess. (Lee Decl. ¶ 28.) Without such exercises, there is higher risk of finger stiffness and contracture; with self-exercise, stiffness will improve in most patients. (Id.)

Specifically, Dr. Lee opined that "the absence of splinting after the first week post-surgery and the repeated recommendations for finger motion were fully within the standard of care," and "if the jail medical staff had encouraged use of a splint for the finger, that splinting would have been outside the standard of care." (Lee Decl. ¶ 32.)

In Dr. Lee's medical opinion, "[t]he most important treatment to lessen risk of contracture is motion exercise." (Lee Decl. ¶ 36A.) Buddy taping, which involves "taping the injured finger to an adjacent finger to encourage injured finger motion," "is not a requisite or a standard of care requirement." (Id.) Rather, buddy taping "is ancillary treatment compared to the primary treatment of motion exercise, sometimes used when the patient is not able to or is resistant to finger motion exercises." (Id.) Dr. Lee declared:

10

> [Plaintiff] testified that he was diligently exercising and massaging his finger as much as 50 times a day. He testified that he reported to his providers at the Jail that he was regularly and diligently exercising his finger, but it was not improving the contracture. As stated above, contractures are not always preventable, even with diligent exercise, and must be surgically corrected as occurred here. There was nothing that buddy taping would have accomplished that diligent self-exercise would not have achieved. If the plaintiff was diligently exercising his finger as he represented in his deposition, most reasonable practitioners would not have recommended buddy taping since self-exercise is more effective. Since self-exercise did not work for [plaintiff], buddy taping was unlikely to have worked as well.

(Lee Decl. ¶ 36A.) "The alleged failure to provide buddy tape in the jail did not cause or worsen the contracture and did not cause the need for [plaintiff] to have surgery." (Lee Decl. ¶ 36C.)

Despite plaintiff's deposition testimony that Dr. Tocchi advised plaintiff to use a specific tape for the buddy tape treatment, Dr. Lee declared that in his experience, he is "not aware of any 'special tape' required for buddy taping." (Lee Decl. ¶ 36B.) "Some practitioners may favor a particular tape; however, many different types of tape can be used. I have used adhesive tape, Coban, electrical tape, and duct tape, as available to the patient." (Id.)

Finally, Dr. Lee also opined that physical therapy is not mandated by the standard of care for plaintiff's situation. (Lee Decl. ¶ 35.) Plaintiff "was advised that formal physical therapy was not available at the jail, so he needed to comply with recommended self-therapy exercises." (Id.) In Dr. Lee's medical opinion, finger contractures are not always preventable, even with physical therapy or home therapy, and may require "surgery to correct the contracture." (Lee Decl. ¶ 35.) "[I]t cannot be said with probability that [plaintiff] would have been any better off with the contracture had he received formal physical therapy earlier while incarcerated." (Id.)

Dr. Lee concluded that all of the care and treatment provided by medical practitioners at the jail was appropriate and within the standard of care. (Lee Decl. ¶ 36C.)

Dr. Lee is Qualified

The undersigned finds Dr. Lee's education, training, credentials, and experience qualifies him as an expert. See Fed. R. Civ. P. 702. Dr. Lee's specialization as a board-certified orthopedic hand surgeon makes him uniquely qualified to opine on whether or not a splint or buddy tape was required for plaintiff's right finger at the time he was booked into the jail and

11

held therein, and to evaluate the medical treatment provided for plaintiff's right ring finger by defendant Dr. Sanga.  Further, Dr. Lee's testimony set forth in his declaration is both relevant and admissible.  Therefore, the undersigned accepts Dr. Lee's opinion as expert testimony under Rule 702 of the Federal Rules of Evidence as to whether the medical care provided by defendant Dr. Sanga was appropriate and met the standard of care.  "[E]xperts are allowed to testify to opinions without having firsthand knowledge, so long as it is permissible in their discipline." Trujillo v. Cty. of Los Angeles, 751 F. App'x 968, 970-71 (9th Cir. 2018) (citation omitted).

Plaintiff's Fourteenth Amendment Claims

As discussed below, defendant Dr. Sanga is entitled to summary judgment on plaintiff's Fourteenth Amendment claims.

Governing Standards

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997).  A determination of "deliberate indifference" involves an examination of two elements:  the seriousness of the prisoner's medical need and the nature of the defendant's response to that need.  See McGuckin, 974 F.2d at 1059.

Where, as here, the inmate is a pretrial detainee rather than a convicted prisoner, the inmate's rights derive from the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment.  See Gibson v. County of Washoe, 290 F.3d 1175, 1187 (9th Cir. 2002) (citing Bell v. Wolfish, 441 U.S. 520, 535 (1979)).  While a deliberate indifference test still applies to a pretrial detainee's claim, it is an objective deliberate indifference test, rather than the subjective deliberate indifference test applicable to a prisoner's claim.  See Gordon v. County of Orange, 888 F.3d 1118, 1122 & n.4 (9th Cir. 2018).

> [T]he elements of a pretrial detainee's medical care claim against an individual defendant under the due process clause of the Fourteenth Amendment are:  (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the

> circumstances would have appreciated the high degree of risk involved -- making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

Id. at 1125. With regard to the third element, defendant's conduct must be objectively unreasonable -- "a test that will necessarily turn[ ] on the facts and circumstances of each particular care." Id. (citations and internal quotation marks omitted). The four-part test articulated in Gordon, 888 F.3d at 1122, requires the inmate to prove more than negligence, but less than subjective intent -- something akin to reckless disregard. Id.

Except where the type of conduct required by the particular circumstances is within the common knowledge of laymen, the standard of care can only be proven by expert testimony. See Hutchinson v. U.S., 838 F.2d 390, 392 (9th Cir. 1988). Thus, "[w]hen a defendant moves for summary judgment and supports the motion with expert declarations that his [or her] conduct fell within the community standard of care, he [or she] is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence." Id.

Discussion

Here, plaintiff provided no opposition, no evidence, and no expert testimony to rebut Dr. Lee's expert opinion. The appropriate treatment for the injury to plaintiff's right finger is not something within a layperson's common knowledge. Thus, plaintiff was required to provide expert testimony to rebut Dr. Lee's opinion that the medical care provided by medical staff at the Sacramento County Jail was within the standard of care. Plaintiff did not.

Dr. Lee opined that motion exercise was the most important treatment for plaintiff's injury to lessen the risk of contracture. It is undisputed that plaintiff was frequently advised to exercise his injured finger, including while he was housed at the jail. Further, Dr. Lee opined that a splint or buddy tape was not required to treat plaintiff's right ring finger injury while plaintiff was housed in the jail, and that the lack of the splint and buddy tape did not cause plaintiff's injuries. Indeed, Dr. Lee found that "if the jail medical staff had encouraged use of a splint for the finger, that splinting would have been outside the standard of care." (Lee Decl. ¶ 32.)

In addition, Dr. Sanga provided her own declaration confirming that she treated plaintiff

only once, on September 7, 2020, which medical records confirm, and on such occasion, Dr. Sanga provided an extensive plan of treatment that included antibiotics, pain control medications, specific wound care, and ordered x-rays and follow-up appointments with plaintiff's medical provider and an orthopedic specialist. (UDF 11, 12.)  Importantly, Dr. Sanga advised plaintiff to elevate his finger and continue passive flexion/extension exercises daily, which met the standard of care for plaintiff's injury as opined by Dr. Lee.[7]  (Sanga Decl. ¶ 5; Lee Decl. ¶¶ 28-29.)

Dr. Lee's expert testimony demonstrates that Dr. Sanga's alleged failure to provide a splint or any buddy taping treatment was not objectively unreasonable.  In addition, Dr. Sanga's evidence demonstrates that her treatment for plaintiff's injured finger on September 7, 2020, did not put plaintiff at substantial risk of suffering serious harm.  To the contrary, the evidence shows Dr. Sanga took efforts to resolve plaintiff's cellulitis, provided plaintiff pain relief and wound care, and she advised him to continue his motion exercises.  Dr. Sanga then followed through by ordering x-rays and scheduling follow-up appointments, including with an orthopedic specialist to address plaintiff's finger injury.  Such an extensive treatment plan cannot be considered deliberately indifferent, even under an objective standard.  This record contains no evidence that Dr. Sanga's medical treatment was objectively unreasonable, and Dr. Sanga is entitled to summary judgment on plaintiff's Fourteenth Amendment claims.

State Law Negligence Claim

Plaintiff's state law negligence claim also fails.

In California, to prevail on a medical malpractice claim, a plaintiff must establish: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of [their] profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or

---

[7] Despite plaintiff's claim that Dr. Sanga evaluated plaintiff again on or about September 10, 2020 (ECF No. 1 at 4), Dr. Sanga did not evaluate him again. (Sanga Decl. at ¶ 7.) On September 9, 2020, Dr. Sanga reviewed plaintiff's x-rays ordered by Dr. Sanga and documented the radiology results in plaintiff's chart. (Id.; see also ECF No. 55-5 at 1.)  There is no evidence that Dr. Sanga treated plaintiff again, or that Dr. Sanga was subsequently responsible for plaintiff's treatment, during the remainder of his time at the jail, including on or after September 25, 2020, after which he claimed his finger was getting worse and he requested physical therapy.

damage resulting from the professional's negligence." Hanson v. Grode, 76 Cal. App. 4th 601, 606 (1999) (internal quotation and citation omitted). "The standard of care in a medical malpractice case requires that medical service providers exercise that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." Barris v. County of Los Angeles, 20 Cal.4th 101, 108 n.1 (1999). Such standard of care can only be proven by expert testimony. Lattimore v. Dickey, 239 Cal. App. 4th 959, 968 (2015) (The standard of care in a California medical malpractice case must be shown by expert testimony); Hutchinson, 838 F.2d at 392. Thus, when a defendant health care provider moves for summary judgment and supports the motion with an expert declaration that his or her conduct met the community standard of care, the defendant is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence. Munro v. Regents of University of California, 215 Cal. App. 3d 977, 984-985 (1989).

As set forth above, Dr. Lee is board certified in hand surgery and qualifies as an expert herein. Dr. Lee opined that at the time plaintiff was housed in the jail, he was not required to wear a splint or use buddy tape, the failure to use such items did not cause plaintiff's injuries, and that the medical care provided by medical staff at the Sacramento County Jail was within the standard of care. Plaintiff provided no expert testimony to rebut Dr. Lee's opinion. Thus, defendant Dr. Sanga is entitled to summary judgment on plaintiff's state law negligence claims.

Conclusion

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Defendant Sanga's motion for summary judgment (ECF No. 55) be granted;

2. Judgment be entered; and

3. This action be terminated.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, plaintiff may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Plaintiff is advised that failure to file objections within the specified

time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated: April 24, 2024

                                         CHI SOO KIM
                                         UNITED STATES MAGISTRATE JUDGE

/1/hess1931.msj.Sanga